2024 IL App (1st) 221956-U

No. 1-22-1956

Order filed June 20, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| KATE O'LAUGHLIN, Individually and as Mother and Next Friend of Sean Hladik, a Minor, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 18 L 2984 |
| NORTHWESTERN MEMORIAL HOSPITAL, NORTHWESTERN MEDICAL FOUNDATION, and MARC FELDSTEIN, M.D., | ) ) ) ) | |
| Defendants | ) ) | Honorable James M. Varga, |
| (Marc Feldstein, M.D., Defendant-Appellee). | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Martin and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: In a medical malpractice jury trial, the trial court did not abuse its discretion when it (1) allowed testimony from defendant's controlled expert that was a logical corollary of that expert's disclosed opinion, (2) allowed defendant's expert to use a video as a demonstrative exhibit about a medical procedure that was not performed in the instant case, and (3) denied plaintiff's request to instruct the jury that contributory negligence of the parents was not an issue in this case.

¶ 2     Plaintiff, Kate O'Laughlin, individually and as mother and next friend of Sean Hladik, a minor, appeals the circuit court's judgment entered in favor of defendant, Marc Feldstein, M.D., after a jury trial on plaintiff's medical malpractice claim. Plaintiff alleged that defendant negligently performed a circumcision, causing a urethral fistula. Defendant denied liability, maintaining that the fistula was a congenital condition for which no one was to blame.

¶ 3     On appeal, plaintiff argues that a new trial is warranted because the court below abused its discretion by (1) allowing the undisclosed opinion of defendant's controlled expert, (2) allowing defendant to impeach plaintiff's expert with a demonstrative video of an inaccurate procedure featuring an irrelevant medical device on direct examination of defendant's own expert, and (3) refusing to instruct the jury that contributory negligence of the parents was not an issue in this case.

¶ 4     For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                          I. BACKGROUND

¶ 6     On November 5, 2014, Sean Hladik was born to Ms. O'Laughlin and David Hladik. The next day, Dr. Feldstein performed a Mogen clamp circumcision. The procedure involves pulling the foreskin forward and clamping down on the excess skin, which is then cut off. The head of the penis and all the other tissue remain on the other side of the clamp. As is common in circumcisions, Sean had some bleeding during the circumcision. Dr. Feldstein used silver nitrate (a chemical) to control the bleeding; stitches were not necessary. He notified the parents that the circumcision went well and they may see some blood due to the removal of the foreskin.

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 7 The following day, Ms. O'Laughlin noticed some blood in Sean's diaper. She stated a significant amount of red blood was on the gauze over the surgical site and within the diaper. Mr. Hladik saw some blood and the stringy material from the gauze used to cover the surgical site. They contacted Dr. Kenneth Polin at Town & Country Pediatrics. On November 7, 2014, at the doctor's office, Ms. O'Laughlin mentioned seeing blood around the surgical site and within Sean's diaper. Ms. O'Laughlin stated the blood was oozing, but no active bleeding was present, nor was it dripping. Dr. Polin removed the gauze from the penis and saw some blood. Dr. Polin documented no active bleeding during the exam. He noted some bleeding after the circumcision, as stated by Dr. Feldstein to Ms. O'Laughlin and Mr. Hladik.

¶ 8 On November 9, 2014, Dr. Anne Wyman at Town & Country Pediatrics saw Sean. Dr. Wyman documented, consistent with Dr. Polin, that silver nitrate stopped the post-procedure bleeding. Dr. Wyman removed gauze stuck to areas of the surgical site, which is common after a circumcision.

¶ 9 When Sean was about two years old and undergoing toilet training, Ms. O'Laughlin noticed urine coming from two locations on his penis. She called Sean's pediatrician, who referred Sean to Dr. Max Maizels, a pediatric urologist. Dr. Maizels found a second pinpoint opening on the ventral (underside) of the penis. Dr. Maizels diagnosed Sean with a urethral fistula, which is a communication from the urethra to the skin. On February 14, 2017, Dr. Maizels closed the urethra fistula.

¶ 10 On March 22, 2018, Ms. O'Laughlin filed this medical negligence action on behalf of Sean against Dr. Feldstein and Northwestern Memorial Hospital (Northwestern), alleging Dr. Feldstein

negligently performed the circumcision. Dr. Feldstein answered the complaint, denying all the material allegations. Plaintiff dismissed Northwestern before trial.

¶ 11    The case proceeded to trial against Dr. Feldstein in August 2022. Plaintiff moved *in limine* to bar any reference or argument that Sean's parents were contributorily negligent. The motion was granted without objection from defendant, who had not filed an affirmative defense alleging contributory negligence.

¶ 12    After trial started, plaintiff's counsel sent defense counsel a link to a video of a Mogen shield circumcision being performed on a different patient, stating plaintiff's intention to use that video to help her expert explain the procedure. Other demonstrative videos of circumcisions with different devices were included in the link. One additional video provided by plaintiff's counsel to the defense included the Gomco circumcision video that plaintiff claims was incorrectly admitted at trial.

¶ 13    Mr. Hladik testified that there was blood in Sean's diaper for the first week, potentially longer, after he was brought home from the hospital. Ms. O'Laughlin testified that by about 10 to 14 days after the procedure, Sean's skin started to heal and scab over. Ms. O'Laughlin and Mr. Hladik both observed a scab on the underside of Sean's penis, which remained there for a few weeks.

¶ 14    Dr. Feldstein testified about the anatomy of the penis and how the urethra is within the penis, surrounded by other tissue. The urine goes through the urethra out the tip of the penis. He explained bleeding is a known risk of any surgical procedure, including a circumcision, because the surgeon uses a sharp scalpel to cut the skin.

¶ 15    Dr. Feldstein explained the circumcision. He used a demonstrative exhibit to provide a visual of the procedure and placement of the Mogen Shield. The procedure begins by lysing the adhesions between the foreskin and head of the penis. The foreskin is elevated away from the head of the penis and a tool is inserted between the foreskin and head of the penis to free the adhesions. Dr. Feldstein performed the lysing with a curved hemostat. The curved hemostat is rotated 360 degrees between the foreskin and head of the penis to clear all the adhesions. The foreskin is then pulled through the Mogen Shield and away from the tip of the penis. The Mogen Shield is a V-shaped clamp that produces a crushing effect on the foreskin pulled through its opening. The Mogen Shield is locked and remains locked for several minutes prior to removing the foreskin. The foreskin located on the far side of the Mogen Shield, opposite the head of the penis, is then removed with a scalpel. The clamp is removed, and the surgical site is dressed.

¶ 16    Dr. Feldstein used the Mogen clamp in 99% of the procedures he has performed throughout his career. He preferred the Mogen clamp to the Gomco clamp because he believes the Mogen clamp better controls and minimizes bleeding. A reasonably careful doctor would place the Mogen clamp perpendicular to the penis and at a 90-degree angle; otherwise the clamp could capture underlying tissue in addition to the foreskin.

¶ 17    Bleeding is common during a circumcision, so silver nitrate was provided with the circumcision tray. Silver nitrate stops superficial bleeds. Dr. Feldstein told the mother about the silver nitrate because he did not want its black appearance to cause any concern.

¶ 18    Dr. Feldstein testified to the rarity of congenital fistulas and how identification of a fistula would have resulted in his not performing the circumcision.

¶ 19    Dr. Feldstein answered hypothetical questions about the possibility of the Mogen Shield's angle causing a fistula. He explained the injury would have been extensive and severe if the Mogen clamp had injured the urethra on the underside of the head of the penis. Closing the Mogen Shield clamp on the urethra would require the head of the penis to be pulled through the clamp as well. For the clamp to close on the urethra, as claimed by plaintiff, all the tissue between the clamp and the urethra would have been crushed, requiring immediate surgical intervention, which was not required here.

¶ 20    Dr. Polin testified that Sean's penis was normal upon exam one day after the circumcision with no active bleeding during the exam. Dr. Polin documented no second opening on the underside of the penis, much less a crushing injury. He clarified his documentation, which left out the appropriate punctuation. He testified that his charting should read, "normal appearance for age. Circ'd was bleeding. At time of exam, not actively bleeding."

¶ 21    Dr. Wyman testified to the thoroughness of the pediatrician's exams and the lack of an identifiable hole at the time of the exams. She explained stringy debris with gauze can be present, no matter how much Vaseline is applied.

¶ 22    Dr. Maizels showed the jury the location of the pinpoint opening in the skin proximal to the head of the penis. He testified about how well his repair surgery went and that Sean never returned following a post-operative visit when he was off pain medications. Dr. Maizels stated the fistula came from the urethra, which means it came from the urethra and worked its way to the surface, not from the surface to the urethra, as plaintiff claimed. Dr. Maizels had not heard from the parents since the follow-up visit a month after the surgery. He testified that the penis was wrinkled and the scar would remodel and improve with age.

¶ 23    Dr. Diane Holmes assumed the role of Sean's primary pediatrician following the initial well child examination. She testified that she thoroughly examined Sean on 10 visits and never noted an opening or a fistula. The "History of Present Illness" in her documentation is subjective and comes from the parents. Therefore, the note about the fistula being there from circumcision was not her professional opinion; rather, it documented a comment made by the mother or father. Dr. Holmes documented no parental concern during any of these visits. Had there been concerns, she would have detailed them. Dr. Holmes stated the opening was on the glans (head) of the penis, while describing the anatomical positioning.

¶ 24    Dr. Richard Luciani is a board-certified obstetrician and gynecologist who has been practicing since 1977. Before he testified as plaintiff's expert, the defense objected to plaintiff showing the jury the Mogen Shield video plaintiff produced after trial had begun. The trial court overruled defendant's objections and allowed plaintiff to show the video during Dr. Luciani's direct examination. Plaintiff played the demonstrative video of a Mogen Shield circumcision early in Dr. Luciani's direct examination. Plaintiff's counsel periodically paused the video and allowed Dr. Luciani to describe what was on the screen. Dr. Luciani testified that if there was a congenital hole in the penis, the circumcision should not have been performed.

¶ 25    Dr. Luciani acknowledged that he had not performed a Mogen Shield circumcision in over 40 years. Instead, he uses a Gomco clamp. He testified that there was no way to injure the glans of the penis with a Gomco clamp because, when using a Gomco, the doctor cuts the foreskin above the coronal groove below the head of the penis. He testified, however, that an injury to the glans can occur with a Mogen clamp.

¶ 26    Dr. Luciani testified that Dr. Feldstein deviated from the standard of care, causing the urethral fistula. Dr. Luciani testified the injury would not occur during the normal course of a circumcision.

¶ 27    Dr. Luciani testified to his opinions about the proper technique and usage, and about how he believed the fistula was caused. Because the clamp was placed at an incorrect low angle, he testified, the urethra was pulled forward into the clamp. Because the urethra is only protected by thin skin and tissue, part of the urethra was crushed and died, creating an abscess and forming the fistula. Dr. Luciani opined that Sean's fistula was not congenital in nature. Rather, it was a crush injury that involved the skin and the urethra, and the damage underneath the skin would be considerable.

¶ 28    After plaintiff rested her case, the defense called its expert witness, Dr. Ann LaBarge, an obstetrician and gynecologist. She used the Mogen clamp exclusively in her practice for 15 years. She testified that Dr. Feldstein met the standard of care. Dr. LaBarge explained how using the Mogen clamp could not result in Sean's injury without evidence of injury to different parts of the penis. The numerous doctor visits, all of which documented no abnormalities, supported this testimony. She explained how an opening of the urethra would not be identified by Dr. Feldstein's examination of the penis because the urethra was under the skin.

¶ 29    Dr. LaBarge testified that bleeding can occur during a circumcision in the absence of negligence. The use of silver nitrate, which is used only for minor, superficial bleeds, is common.

¶ 30    With the assistance of a demonstrative exhibit, Dr. LaBarge explained how a Mogen circumcision could not injure the urethra behind the head of the penis. Her main point was that Sean's fistula was nowhere near where the Mogen clamp is compressed. Also, it would be nearly

impossible to pull enough of the foreskin through the clamp to damage the urethra. Dr. LaBarge explained how the whole head of the penis would have to be pulled through the Mogen Shield to cause the injury plaintiff described, which would have resulted in a much more severe injury based on the fistula's location. Although damage to the glans and the tip of the urethra can occur, there would be collateral damage that would be "quite traumatic" if it did. Over plaintiff's objection, Dr. LaBarge testified that a child would not be able to urinate if the urethra was pulled into the clamp and crushed.

¶ 31 Dr. LaBarge's direct exam concluded with testimony describing the difference between the Mogen and Gomco circumcisions. Plaintiff did not object to Dr. LaBarge's testimony, but did object to defendant's use of the Gomco circumcision video to illustrate that testimony. Defense counsel responded that Dr. Luciani solely used the Gomco Shield after his residency and the video of that method allowed the jury to see the difference between the Gomco and Mogen methods. Over plaintiff's objection, Dr. LaBarge explained the process of performing a Gomco clamp circumcision as the video played, detailing how the Gomco and Mogen procedures are quite different.

¶ 32 Another defense expert, Dr. Marc Cendron, a pediatric urologist, testified to his expert opinion on causation. He testified about his credentials, understanding of urethral fistulas, and how the Mogen Shield did not cause the alleged injury. He testified that Sean's fistula was congenital and was not caused by the circumcision. He testified that surgical trauma from a circumcision would appear as a traumatic injury to the glans of the penis and would result in significant scar tissue. He conceded that the urethra can be injured by the crushing mechanism of the clamp and

acknowledged that if the tissue surrounding the urethra is underdeveloped, the urethra can be injured without significant bleeding.

¶ 33     The jury returned a verdict for the defense. Plaintiff filed a posttrial motion, which the trial court denied.

¶ 34                                    II. ANALYSIS

¶ 35                              A. Dr. LaBarge's Opinion

¶ 36     Plaintiff argues the trial court abused its discretion by allowing Dr. LaBarge, defendant's controlled expert, to testify, in violation of Illinois Supreme Court Rule 213, that an infant would not be able to urinate if his urethra was crushed during a Mogen clamp circumcision.

¶ 37     Rule 213 states in pertinent part that, "[f]or each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefore; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). Furthermore,

>     "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial. Information expressed in a discovery deposition need not be later specifically identified in a Rule 213(f) answer, but, upon objection at trial, the burden is on the proponent of the witness to prove the information was provided in a Rule 213(f) answer or in the discovery deposition." *Id.* 213(g).

¶ 38     The purpose of discovery rules, governing the "timely disclosure of expert witnesses, their opinions, and the bases for those opinions[,] is to avoid surprise and to discourage strategic gamesmanship." *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1032 (2003). Rule 213

disclosures are mandatory and strict compliance is required. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004). A party's Rule 213 disclosures must "drop down to specifics" (*id.*); however, a "witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion rather than new reasons for it" (*Foley v. Fletcher,* 361 Ill. App. 3d 39, 47 (2005)). "The testimony at trial must be encompassed by the original opinion." *Id.* Permitting either side to ignore Rule 213's plain language defeats its purpose and encourages tactical gamesmanship. *Sullivan*, 209 Ill. 2d at 109-10. As a result, expert testimony may be barred where there is inadequate disclosure of all opinions and the bases therefor. *Petre v. Kucich*, 331 Ill. App. 3d 935, 946 (2002).

¶ 39    Whether to admit or exclude evidence, including whether to allow an expert to present certain opinions, "rests solely within the discretion of the trial court and will not be disturbed absent an abuse of discretion"—*i.e.*, only if " 'no reasonable person would take the view adopted by the trial court.' " *Foley*, 361 Ill. App. 3d at 46 (quoting *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003)). " '[E]rror in the exclusion or admission of evidence does not require reversal unless one party has been prejudiced or the result of the trial has been materially affected.' " *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 814 (2009) (quoting *Stricklin v. Chapman*, 197 Ill. App. 3d 385, 388 (1990)).

¶ 40    Plaintiff contends that Dr. LaBarge's challenged opinion was not a logical corollary to any opinion the defense disclosed before trial. Plaintiff argues that Dr. LaBarge's undisclosed opinion was highly prejudicial because it directly undercut plaintiff's theory of causation where plaintiff's expert, Dr. Luciani, opined that Sean's urethral fistula was caused by Dr. Feldstein's negligent use during Sean's circumcision of a Mogen clamp, which crushed Sean's urethra. Plaintiff also argues

that Dr. LaBarge's undisclosed opinion was highly prejudicial because it denied plaintiff a fair opportunity to prepare for cross-examination or otherwise respond to defendant's new argument.

¶ 41   Defendant responds that the trial court was within its discretion to let Dr. LaBarge say that urine could not pass through a crushed urethra because her brief remark was a logical corollary to her disclosed opinion that the clamp did not crush the urethra and cause a fistula. Defendant contends that plaintiff recognized this line of questioning as part of Dr. LaBarge's disclosed opinions and allowed substantial testimony on the subject without objecting until plaintiff objected to the question and answer at issue. Defendant argues that the challenged exchange was brief, was properly allowed, caused plaintiff no prejudice, and provides no basis for reversal.

¶ 42   During discovery, defendant disclosed that Dr. LaBarge would testify regarding her knowledge of the methods, advantages, and risks of the methods of performing a circumcision; that Dr. Feldstein's pre-operative assessment, examination, and performance of the procedure complied with the standard of care; that no act or omission of Dr. Feldstein contributed to Sean's injuries; that Dr. Feldstein's failure to notice the urethral fistula on examination did not mean it was not present, and failing to notice it was not a deviation from the standard of care; that the fistula was so small that it was not noticed by Sean's parents for the first two years of his life; that the fistula could not have been caused by the Mogen clamp circumcision performed by Dr. Feldstein because the location of the fistula on the distal shaft of the penis was not in the area affected by the mechanism of the Mogen clamp, which does not go down to the area where the fistula was located; and that the fistula was congenital.

¶ 43    At her discovery deposition, Dr. LaBarge testified:

"Q. Are there any other reasons or reasons for your opinion that this is a congenital injury?

A. Well, if it's either the—got to be either the Mogen or the circumcision or not the circumcision and it's congenital. It's congenital. I don't believe the Mogen caused this injury. It's just not in the right spot. It's—

Q. Right. That's what I am getting at. I think you answered my question, but let me try to—. Other than the Mogen not being in the spot where this injury occurred and you not doing the procedure around that injury, is there any other reasons why you believe that this injury was not caused by the Mogen clamp or have you told me all the reasons?

A. I think so.

* * *

Q. The only two real possibilities—and I understand your opinion that the Mogen did not cause this, but the real possibilities in this case are, one, it was a circumcision or two, it was congenital. There is really no other mechanism of injury other than those two things, is that fair?

A. Yes, I think that's correct."

¶ 44    During direct examination of Dr. LaBarge at trial, her opinions about collateral damage to the penis were admitted into evidence without objection. Specifically, she testified:

"Q. If this can't happen just say so, but if the urethra is somehow pulled forward into the clamp and crushed by the clamp, what else would be injured?

A. I would imagine the glans would be injured. You'd have, you'd have collateral damage for that. ***

* * *

There would be terrible damage to this penis."

Thereafter, Dr. LaBarge held a Mogen clamp up to the jury and explained the circumcision procedure, testifying:

"A. You hold onto that and you take as much as you want, and then you bring this around, you clamp it. And then you can tighten, and you see there's line between them, there's no light, there's no anything, but basically just smooshes the tissue, and then you take a scalpel, and you just shave it off.

Then you release it, open it up. The penis pops out. You open that area of tissue that's been squished, and the circumcision is done. You just push it back.

And again, it's at the tip. It's nowhere near. I can't imagine how you could ever pull that much penis in and not have damage to the penis. Like you couldn't. It's just impossible.

Q. If you crushed the urethra in the clamp, would the child be able to urinate after?"

¶ 45    Plaintiff objected that the opinion was undisclosed in violation of Rule 213, and defense counsel responded, "I think it's a logical corollary what she's describing in the anatomy of a circumcision." The court overruled plaintiff's objection, and Dr. LaBarge testified:

"Q. Could a child urinate if the urethra was pulled into the clamp and crushed"

A.  No. It would be smooshed. That's really tight."

¶ 46    Later, during cross-examination, plaintiff's counsel asked Dr. LaBarge, "Okay. And if the clamp is not placed correctly, the urethra might get damaged, there might be some collateral damage as well, but the urethra might be damaged, correct?"

¶ 47    During closing argument, defense counsel argued, "crushing the urethra inside the clamp, which is what Dr. Luciani claimed, would have been a catastrophic occurrence. The urethra, as Dr. LaBarge said, would have been crushed closed. The poor baby would not have been able to urinate."

¶ 48    We conclude that the trial court was within its discretion to allow Dr. LaBarge to elaborate briefly on her opinion that the circumcision could not have been performed in the way plaintiff claimed based on Dr. LaBarge's disclosed opinion that Sean's urethral fistula could not have been caused by the Mogen clamp circumcision because the fistula, which was located on the distal shaft of the penis, occurred outside of the area that is affected by the mechanism of the Mogen clamp. Consistent with this disclosed opinion, defense counsel responded to plaintiff's Rule 213 objection at trial by observing that Dr. LaBarge was describing "the anatomy of a circumcision." Dr. LaBarge's testimony about the anatomical features of a circumcision was neither a new opinion nor a new basis for her expert opinion; it illustrated her opinion that, contrary to plaintiff's theory that the Mogen clamp caused the urethral fistula, the Mogen clamp did not affect the urethra because if the clamp had crushed the urethra, then urine would have been blocked.

¶ 49    We review Dr. LaBarge's challenged remark in the context of her unchallenged testimony at trial and her disclosed opinion that plaintiff's causation theory was at odds with the anatomy of the penis, especially the location of the clamp in relation to the urethral fistula. Moreover, Rule 213 does not require a verbatim recitation at trial of the opinions disclosed in discovery. " 'A

witness may elaborate on a disclosed opinion as long as the testimony states logical corollaries to the opinion rather than new reasons for it.' " *Spaetzel*, 393 Ill. App. 3d at 812 (quoting *Foley*, 361 Ill. App. 3d at 47); see *Skubak v. Lutheran General Health Care Systems*, 339 Ill. App. 3d 30, 39 (2003); *Brax v. Kennedy*, 363 Ill. App. 3d 343, 355-56 (2005). Defendant's Rule 213 disclosures set forth the location of the fistula as key to the defense, because the clamp was placed distal to (beyond) the head of the penis, not on the urethra within the penis and proximal to the head.

¶ 50      Dr. LaBarge's opinions about collateral damage to the penis were admitted into evidence without objection. Plaintiff even elicited testimony about collateral damage to the urethra in cross-examining Dr. LaBarge. Dr. LaBarge had already testified without objection that the Mogen clamp "smooshes the tissue." Near the end of her extended testimony about how and where a Mogen clamp is used in performing a circumcision, Dr. LaBarge said nothing significantly different in her brief answer to the follow up question, stating that urine could not come through a "smooshed" urethra. Her answer illustrated her opinion countering plaintiff's theory by way of a logical corollary that did not violate Rule 213. If the clamp crushed the urethra closed and the scalpel removed everything on the other side of the clamp, the urine would not come through the urethra. Defendant disclosed Dr. LaBarge's opinions about the anatomy of the penis, including the urethra and the location of the fistula, relative to the placement of the clamp.

¶ 51      Dr. LaBarge's remark was well within an expert's latitude to elaborate on a disclosed opinion, and the trial court's conclusion that the answer was a logical corollary was within its discretion and does not call for a new trial.

¶ 52                    B. Demonstrative Exhibit

¶ 53    Plaintiff argues that the trial court abused its discretion when, during the direct examination of Dr. LaBarge, the court allowed admission of an eight-minute-long video depicting a Gomco clamp, which did not explain Dr. LaBarge's testimony. Plaintiff argues the video was admitted solely to impeach Dr. Luciani's credibility and qualifications, whereby defendant argued that Dr. Luciani's opinions carried less weight because he used the Gomco clamp instead of the Mogen clamp in most of the circumcisions he performed throughout his career. Plaintiff contends the Gomco clamp video should have been disallowed because it (1) failed to accurately depict the procedure actually performed on Sean, (2) allowed Dr. LaBarge to use demonstrative evidence to indirectly comment on Dr. Luciani's qualifications and credibility and thereby "go after" him because he used a Gomco clamp instead of a Mogen clamp, (3) did not contradict any of Dr. Luciani's testimony and thus should not have been allowed for impeachment, (4) should have been barred as improper extrinsic evidence on a collateral issue, (5) was admitted without a proper foundation, and (6) was unfairly prejudicial to plaintiff. Plaintiff contends that allowing the video was particularly prejudicial given the trial court's earlier decision to prohibit Dr. Luciani from testifying that the reason he lacked experience with a Mogen clamp was because he preferred the Gomco clamp for safety reasons. According to plaintiff, the jury was left with the unfair impression that Dr. Luciani, plaintiff's only expert, was inexperienced and unqualified to discuss the Mogen clamp procedure at issue and that his theory of causation was anatomically impossible. Plaintiff adds that because these attacks were launched after Dr. Luciani had already testified, plaintiff was denied the fair warning demanded by the discovery rules and was deprived of the opportunity to prepare and respond.

¶ 54    Defendant responds that demonstrative trial exhibits are admissible to illustrate a witness's testimony if they accurately represent what they purport to represent.  The defense showed a video of the Gomco circumcision method Dr. Luciani used to show how that method differed from the Mogen method used in this case, as Dr. LaBarge explained without objection. Defendant argues that the video was relevant to the jury's comparison of the two experts and their experience with the Mogen clamp and procedure at issue here.

¶ 55    A physical object that does not have a direct part in the incident at issue and is only being used to help explain or illustrate to the trier of fact the verbal testimony of a witness or other evidence is considered to be demonstrative evidence. *Smith v. Ohio Oil Co.*, 10 Ill. App. 2d 67, 74 (1956). Demonstrative evidence has no probative value in and of itself and is merely admitted or used as a visual aid to the trier of fact. *Id.; Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 341-42 (1991). The great value of demonstrative evidence "lies in the human factor of understanding better what is seen than what is heard." *Smith*, 10 Ill. App. 2d at 75. The use of demonstrative evidence, therefore, is looked upon favorably by the courts because it allows the trier of fact to have the best possible understanding of the matters before it. *Id.* at 75-76. However, the same human factor that makes demonstrative evidence valuable—that people learn and understand better what they see, rather than what they hear—also makes it possible for parties to abuse the use of demonstrative evidence by giving a dramatic effect or undue or misleading emphasis to some issue, at the expense of others. *Id.* at 76. Thus, in ruling upon the admissibility of demonstrative evidence, the trial court must be watchful to prevent or eliminate that abuse. *Id.* at 76-77.

¶ 56     The primary considerations in determining whether demonstrative evidence is admissible or may be used at trial are relevancy and fairness. See Ill. Rs. Evid. 401, 402, 403 (eff. Jan. 1, 2011); *Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 337 (2000); *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 283-84 (2003); *Smith*, 10 Ill. App. 2d at 74-77. As for relevancy, for demonstrative evidence to be admissible, it must actually be used to illustrate or explain the verbal testimony of a witness as to a matter that is relevant in the case in question. See *id.*; Michael H. Graham, Graham's Handbook of Illinois Evidence § 401.3, at 160 (10th ed. 2010). With regard to fairness, even if the relevancy test has been satisfied, demonstrative evidence may still be excluded by the trial court if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Ill. R. Evid. 403 (eff. Jan. 1, 2011); *Sherman*, 203 Ill. 2d at 284; *Cisarik*, 144 Ill. 2d at 342. A trial court's ruling on the admissibility of evidence, including demonstrative evidence will not be reversed on appeal absent an abuse of discretion. *Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 29.

¶ 57     Despite plaintiff's numerous objections raised on appeal, her objection that the Gomco video was irrelevant was the only one she made both at trial and in her posttrial motion. Thus, plaintiff has forfeited all but one of the arguments she raises on appeal by failing to raise them both at trial or in her posttrial motion. See *Gillespie v. University of Chicago Hospitals*, 387 Ill. App. 3d 540, 546 (2008); *Dynek v. City of Chicago*, 2020 IL App (1st) 190209, ¶ 61 (In addition to a timely objection at trial, preservation of error for appellate review requires "a sufficiently specific posttrial motion that contains the points relied upon and specifies the grounds in support thereof."). Although plaintiff mentioned a "213 issue," she did not elaborate or renew any Rule

213 objection in her posttrial motion. Plaintiff made no foundation objection, nor did she object that the video depiction was not accurate. In her posttrial motion, plaintiff argued only that the video was "misleading" and "extremely bloody/gory and was prejudicial to the [p]laintiff." The motion did not take issue with Dr. LaBarge's testimony about the procedure with a Gomco clamp. Nor did plaintiff object that the video was improperly used to challenge her expert's credibility, that it was improper extrinsic evidence on a collateral matter, or that it improperly focused on her expert's credentials and experience. Accordingly, we address the only contention plaintiff preserved for review: that the Gomco video should have been barred because the device and procedure it depicted were substantially different from the Mogen device and procedure at issue.

¶ 58    The Gomco video was not meant to represent the circumcision at issue, let alone to depict it. Dr. LaBarge testified without objection about the different procedure and different clamp that Dr. Luciani used in his practice instead of the Mogen clamp used here, and the video accurately illustrated Dr. LaBarge's testimony to that effect. Plaintiff did not take issue at trial or in her posttrial motion or any related filing or hearing in the trial court with Dr. LaBarge's testimony describing a circumcision procedure as performed using a Gomco clamp. Even on appeal, plaintiff offers no objection to the expert testimony itself; she challenges only that the video was "used to help explain or illustrate to the trier of fact the verbal testimony of a witness," just as demonstrative evidence is supposed to do. See *Sharbono*, 2014 IL App (3d) 120597, ¶ 30. The difference between the two methods was a prominent point of Dr. LaBarge's testimony. Defense counsel elicited Dr. LaBarge's opinion that the video depicted a procedure that was not the same as the use of the Mogen clamp:

"Q. And are all of the steps they've just seen completely different from the Mogen clamp procedure?

A. Definitely from here on out, *it's definitely different*." (Emphasis added.)

¶ 59     Plaintiff objects to the use of "a demonstrative video of an inaccurate procedure featuring an irrelevant medical device." But the video accurately depicted what it purported to depict: a different procedure using a different clamp. Nor was the video "irrelevant"; plaintiff's argument overlooks the purpose of the video to illustrate the Gomco procedure and technique Dr. Luciani used, and to emphasize the substantial difference between that procedure and the Mogen procedure at issue, about which he professed expertise despite not having used it since his training more than 40 years ago. Dr. Luciani made the depiction of the Gomco procedure more relevant by describing the technique as "similar" to the Mogen technique. The Gomco video was never intended to depict the event at issue, and the defense did not identify it to the jury that way. To the contrary, Dr. LaBarge was clear in explaining that the video did not depict the circumcision at issue. It was an accurate portrayal of what it purported to show—the different procedure Dr. Luciani used. The trial court was within its discretion to admit it for that purpose.

¶ 60     This purpose sets this case apart from *Yanello v. Park Family Dental*, 2017 IL App (3d) 120592, cited by plaintiff. In *Yanello*, the court found it improper to use demonstrative exhibits— in that case, skulls originally used for demonstrative purposes—as real evidence, as if they faithfully represented the anatomy of the patient-plaintiff. *Id.* ¶ 34. Here, the defense did not use the video as real evidence; to the contrary, the defense not only acknowledged that the procedure depicted in the video was something different from the procedure at issue, but stressed that that was the point of showing it.

¶ 61    Furthermore, plaintiff's expert's experience with a different device and procedure was relevant to challenging his credibility. This court drew a distinction between attempts to impeach an expert's opinion with matters going to schooling and licensing, which have an "attenuated relevance to the medical opinion in issue" and are generally inadmissible, and impeachment with "a clear link to facts and assumptions underlying the opinion, the methodology or testing used, *the knowledge and experience of the expert in the matters to which he testifies*, personal bias (such as the fact he or she is paid to testify), and so forth." (Emphasis added.) *O'Brien v. Meyer*, 196 Ill. App. 3d 457, 462-63 (1989). While the court found it improper for the defense to inform the jury of the expert's history of failing the state licensing exam, the court contrasted that impropriety with the proper conduct of showing the jury that, although she did read and interpret X-rays, she would defer to trained radiologists—which the court described as "the type of impeaching examination that aids the jury in deciding the strength of the opinion[.]" *Id.* at 464.

¶ 62    Dr. Luciani conceded that he used the Gomco clamp and had not performed a circumcision using the Mogen clamp since his training four decades before. While he acknowledged the Gomco clamp was a "[t]otally different piece of metal," he claimed that "the technique is very similar." Dr. LaBarge, however, testified that a circumcision is a very different procedure with a Gomco clamp. Her testimony had a clear link to Dr. Luciani's knowledge and experience in the matter to which he testified and was the type of evidence that aided the jury in deciding the strength of his opinion. Plaintiff did not object to Dr. LaBarge's testimony on this point at trial and does not challenge it on appeal. The video illustrated her testimony, and the trial court was well within its discretion to let the defendant use it for that purpose.

¶ 63    Furthermore, plaintiff shows no unfair prejudice resulting from the video. The defense stressed throughout Dr. LaBarge's testimony that the Gomco video did not show the Mogen device at issue, and the trial court cured any potential unfair prejudice by instructing the jury that the Gomco video was for demonstrative purposes only.

¶ 64    Plaintiff cited *Poole v. University of Chicago*, 186 Ill. App. 3d 554 (1989), to support her claim that improper impeachment evidence causes prejudice that requires a new trial. In *Poole*, the defense attacked the plaintiff's expert with evidence that he faced disciplinary charges in another state. Furthermore, that improper evidence alone was not the basis for a new trial in *Poole*; prejudice resulted from the defense counsel's closing argument, in which he relied on the improper evidence to persuade the jury that the plaintiff's expert could not be trusted. Drawing the jury's attention to the pending disciplinary charges against the plaintiff's expert, the defense counsel described the charges as involving "incompetence" and accused the plaintiff's expert of being a "liar" and a "prostitute." *Id.* at 561. Here, plaintiff quotes the court's observation in *Poole* that "[t]he prejudice to plaintiff is readily apparent" (*id.*), but plaintiff ignores the inflammatory accusations prompting that observation.

¶ 65    Defense counsel's closing argument was nothing like *Poole*. Here, defense counsel urged the jury to consider Dr. LaBarge more credible than Dr. Luciani based on the differences in their professional backgrounds, barely alluding to the Gomco clamp. Defense counsel's unremarkable rhetorical questions about which expert the jury should trust more were appropriate argument in this medical-malpractice case featuring competing experts, and not at all what the court found unfairly prejudicial in *Poole*.

¶ 66    Plaintiff's other claim of prejudice, that the video was not timely disclosed, is meritless. Defendant disclosed in answers to interrogatories that Dr. LaBarge would testify to the different methods of performing a circumcision, expressly identifying both the Mogen clamp and the Gomco clamp among those methods. The defense even disclosed that Dr. LaBarge might use demonstrative evidence in doing so—a disclosure that went beyond what Supreme Court Rule 213 requires, according to the Committee Comments to the rule, which expressly provide that it does not apply to demonstrative evidence. See Ill. S. Ct. R. 213, Committee Comments (adopted March 28, 2002). If this argument is the "213 issue" plaintiff's trial counsel mentioned during Dr. LaBarge's testimony, plaintiff did not adequately explain it at trial and forfeited it by not raising it in her posttrial motion. *Gillespie*, 387 Ill. App. 3d at 546. Her claim that the video was not disclosed is at odds with the record and has no legal merit.

¶ 67                                   C. Jury Instruction

¶ 68    Plaintiff argues the trial court abused its discretion by refusing to give Illinois Pattern Jury Instructions, Civil, No. 11.04 (hereinafter IPI Civil No. 11.04) regarding the nonexistence of contributory negligence of Sean's parents, contending that defendant repeatedly pointed out at trial that Sean's parents failed to observe or report evidence of a urethral fistula for over two years. Plaintiff argues defendant improperly insinuated to the jury that Sean's parents were somehow at fault and invited the jury to decide the case based on acts of non-defendants rather than based on what the defendant saw and did in a case where contributory negligence was not an issue.

¶ 69    According to plaintiff, defendant used Sean's parents' failure to observe the abnormality to suggest that Dr. Feldstein did not breach the standard of care when he failed to observe the abnormality before the circumcision and to suggest that he did not cause the fistula because no

abnormality was apparent after surgery. Plaintiff argues that it is not appropriate to defend a medical malpractice case on the basis of what others did or did not do, and the proper question for the jury was whether Dr. Feldstein, not Sean's parents, deviated from the standard of care by failing to observe the abnormality. Plaintiff contends that defendant's argument improperly shifted the burden to disprove contributory negligence to plaintiff and interjected a misleading and prejudicial theory that was at direct odds with the testimony of defendant's own expert. Plaintiff asserts that, given the manner in which defendant used the evidence and argued this theory to the jury, the trial court's failure to instruct the jury that the contributory negligence of Sean's parents was not an issue in the case was an abuse of discretion.

¶ 70    Defendant responds that he made no argument and elicited no evidence that Sean's parents caused or contributed to cause what the defense maintained was a congenital defect, and the trial court did not abuse its discretion by refusing to instruct the jury that contributory negligence was not an issue in the case.

¶ 71    Whether to provide a particular jury instruction is within the sound discretion of the trial court, and the court's decision will be reversed only where the trial court abused its discretion. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 203 (2006). " 'The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law.' " *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13) (quoting *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002)); *Bailey v. Mercy Hospital & Medical Center*, 2021 IL 126748, ¶ 42 (review of the refusal of a jury instruction does not require reversal unless the trial court has abused its discretion and caused prejudice to the complaining party).

¶ 72    The trial court was within its discretion when it declined to instruct the jury that the contributory negligence of the parents was not an issue, refusing plaintiff's tendered IPI Civil No. 11.04. Our review of the record shows no reason to think the jury needed to be disabused of the notion that contributory negligence was at issue, because no evidence or argument suggested that the abnormality was caused by anything Sean's parents did or failed to do, negligently or otherwise. No argument even implicitly criticized the parents for not noticing the abnormality or reporting it to Sean's pediatrician sooner than they did. To the contrary, defense expert witness Cendron stated and defense counsel argued that Sean was born with the fistula, a congenital anomaly that was no one's fault and went unnoticed by all the doctors, including defendant, because the opening was too small to see. This argument did not suggest that the parents were contributorily negligent and did not require an instruction not to consider that issue. The refusal of that instruction does not require a new trial.

¶ 73    Plaintiff also argues that "defendant also used Sean's parents' failure to identify the abnormality to imply that Dr. Feldstein did not deviate from the standard of care." That argument does not relate to contributory negligence. Nor does plaintiff's account bear any resemblance to the events of trial. Although plaintiff complains about what defendant "implied" about the abnormality and the "notion" he "managed to advance," plaintiff identifies no evidence or argument to which she objected, let alone anything the trial court allowed over an objection.

¶ 74    The trial court was within its discretion to refrain from instructing the jury that contributory negligence was not an issue. Without any suggestion in the evidence or argument that the parents caused the fistula, the trial court reasonably concluded the jury was unlikely to find them contributorily negligent. By contrast, raising the issue of contributory negligence solely for the

purpose of telling the jury that it was not an issue could have caused confusion. The trial court's refusal of an instruction emphasizing a non-issue was well within its discretion and is no reason to disturb the jury's verdict.

¶ 75                                    III. CONCLUSION

¶ 76     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 77     Affirmed.